Good morning. May it please the Court, Phil Talmadge and Barbara Holland here representing the appellants, collectively the vessel owner in this case. Roger Murray may have experienced a very brief low voltage 41 to 58 volt shock while he was working as a longshoreman offloading the MV APL Ireland. Mr. Talmadge, would you cite me to the record where that range of controversy? Well, Your Honor, it's cited in our brief. There's a specific reference in the record, and I'll get that when I stand up again, that indicated that it was perhaps a 100 volt shock, but it effectively was 41 to 58 volts. We asserted that in our opening brief and it's never been contested by the appellees in response to that. And why was it a 50 volt shock instead of 110? The expert concluded that because it was brief and because of the nature of the shock, it was that low in effect. Not because the gloves he had on? I think from all these circumstances of the exposure, Your Honor. Is that in dispute? We didn't hear anything from them in response to that assertion in the brief of appellee. The reason I say that is because I was reading the report of the plaintiff's expert and he posited a 110 volt shock, not a 50 volt shock, and so I was confused. Even if it were a 110 volts, Your Honor, it would be a very low volt shock, a very low impact electrical shock. But our testimony was 41 to 58 and that was not disputed in the brief of appellee, as I recall. And I'll get the specific citation to the reporter's transcript when I stand down and get that to the court. The bottom line is from that event, he claims an array of symptoms that go in various parts of the body outside the course of the current that he would have experienced. The district court here erred both in instructing the jury on the turnover duty that was owed under Section 905B as well as it erred in connection with these issues of reliability of the expert testimony. The trial court here failed to act as a gatekeeper as is required by Daubert to prevent fundamentally unreliable expert testimony on an extremely novel scientific theory to come before the jury. It's for that reason that we've asked the court to reverse. Let me turn first to the instructional error issue. The district court's instruction number 14 misstates the vessel owner's turnover duty. Here the plaintiff decided that they were going to proceed under a turnover duty standard. Cyndia talks about three different duties that a vessel owner owes to or you get to your argument as to that instruction. I read instruction number 14 and I read what you said. The objection of trial was to the sentence, defendants have a duty to take reasonable steps to inspect the vessel and its equipment. That was part of it, Your Honor, but if you Well, but I mean, you show me different. It seems to me that everybody agreed with all of this part of instruction 14 except you disagreed with this duty to take reasonable steps to inspect the vessel and its equipment. Further, I understand when I read your objection that you said the instruction erroneously allowed the jury to find a failure to inspect in and of itself was a failure to exercise reasonable care and therefore you objected. That was part of it, Your Honor, but where's the rest? I mean, if you point me to the record, I didn't find anything else in your objection. The objections were also had to the proposed instructions from the defense here and proposed instructions 17 and 19 address the issue of the duty being owed only to the stevedore and also address the issue of the duration of the obligation of the turnover duty. If you look at both instruction, proposed instruction 17 and proposed instruction 19, they mirror the argument that we're now raising here, which is instruction number 14 was flawed for three reasons. The first was the duty to inspect. So I have to look at what you said on these other instructions to really understand why you were objecting this 14? No. I mean, I read it. I was trying to determine what your objection was because their first thing to me is, well, he's waived that. Preserve it, sure. He didn't preserve it. So I went and I read it and I said, well, you know, that's pretty simple because now he's not suggesting that this instruction is wrong because of what it might allow the jury to find, but he's saying it's wrong because now there's a different duty, different duty owed to a different source. And I didn't find that in your objection. Well, Your Honor, what Mr. Murray would have you do is ignore the objections that were made to the failure to give proposed instruction 17 and proposed instruction 19, which made 100% clear that the objection included the fact that the duty was proposed to be to the longshoreman directly instead of the stevedore. And also the question about the duration of this, the carrying on of duty, so much as it was an ongoing obligation on the part of the vessel owner with respect to hazards that might have existed on the vessel. And so all of those issues, there was a specific objection to the district court's instruction number 14, but you have to look at it in the context also of the objection to the failure to give defense 17 and defense 19, which surfaced the issues that we're talking about here today. If I look at the owner's safety manual, what does it say regarding inspections? The owner's safety manual? Yeah. I don't recall off the top of my head, Your Honor. Well, it seems to me that the owner's safety manual says that an inspection is properly part of an exercise of reasonable care. And I didn't find anywhere here where you ever dispute that your client bore responsibility for the floodlight that you placed on the vessel's catwalk. Well, first of all, we do dispute that we placed it on the catwalk because there was a concurrent duty owed by EGLE, the stevedoring firm, that had a responsibility with respect to lighting of the cargo operations. In other words, you owed one, but they also owed one? They owe a concurrent duty, which is consistent with the notion that the duty is owed to the stevedore as opposed to directly to the longshoreman. But let me point out that the placement of the light was something that we do dispute as to whether or not we did it. It was something that was part and parcel of the responsibility of EGLE with respect to cargo operations, and it had nothing to do, of course, with the turnover duty. So if we talk about the light itself, in order to understand the argument that they're advancing, they're suggesting to you what amounts to, tantamount to, a vessel seaworthiness claim, that we have an obligation with respect to each and every piece of equipment on board this ship, each and every aspect of the vessel, before the duty is turned over, before the obligation is turned over to the stevedore to do the work. I understand your argument. Now I want to look at what's your defense. It seemed to me that your defense at trial was the workman was either not injured or he was injured by his own negligence. That was an argument that wasn't, in fact, advanced, Your Honor. Well, frankly, I don't see any other argument. Well, there was an argument made, Your Honor, with respect to proposed Instruction 17, proposed Instruction 19. Well, I'm not talking about the instructions. No, I understand that. I'm talking about what was the evidence, what was the effort expended by the defense, and it seems to me there was nothing in the defense that ever suggested, well, this was the stevedore's duty. There was nothing in there that said, well, there may have been a problem, but we didn't cause it, which I've been on the defense a lot of times, and I love to give other people a defense. The defense was the workman was not injured or he was injured of his own fault. Now, tell me, what does this instruction and the way you want to change it have to do with those defenses? Well, Your Honor, it goes to the general obligation that the vessel owner has at the turnover. Just a minute. Talk about your defense. What does it matter whose duty it is as to this light if your defense is simply no injury or he caused his own problem? That was part of the argument, Your Honor, but the argument that was addressed- Where did you argue anything else at trial? We argued about- Not in the jury instruction conference. At trial. Understand, we presented evidence with respect to Eagle's responsibility. There was evidence presented with respect to Eagle's responsibility as the stevedore that was concurrent. Say that in your closing. Your closing was all about this workman was not injured, or if he was, it was injured by his own negligence. That was your total argument. Well, Your Honor, we also argued with respect to the stevedore here, but we were foreclosed from doing so by virtue of the fact that Judge Blasnick refused to give instruction 17 or 19 that enabled us to make that kind of argument. Okay. So we were foreclosed- I understand now what you're- From being able to present that. I understand your response. And in addition- Before your time runs out, I want to talk about Daubert. So I don't know if you're ready to do that. I will, Your Honor. And let me hasten to add one further thing, and that is we did argue very aggressively about the proposition that the duty to inspect was an ongoing duty to And we argued vigorously that that was not the case under the instruction. But let me turn to the Daubert issue. Let me tell you specifically the issue I'm interested in. Yes. This isn't a case where Judge Blasnick just said, let it in. He went through a number of factors about the subject, about peer review, saying it was grounded in science. He cited the advisory notes. So in light of that explanation and Kumho Tyer's teaching that basically there are specific factors, but the district courts determine which may or may not be addressed or want to be addressed, why wouldn't that be sufficient on an abuse of discretion standards? Well, because the district court in this case did not go through the specific reliability factors- But Kumho tells you you don't have to. Well, you have to at least make an effort to consider reliability. And let's take a look at what Judge Blasnick did here. What Kumho says is that the court had made clear that Daubert's specific factors, whether or not you need to use those in a particular case, is really in the broad discretion of Blasnick or analysis he should have made. Well, the thing here is Judge Blasnick essentially punted the issue of reliability of this expert testimony, Dr. Morse in particular, to the jury. The jury gets all of these articles about the concept for it to consider. But the bottom line here is this court can take as a matter of course here. Can the theory be tested? No. Dr. Morse himself testifies that there are no diagnostic tools with respect to this extreme theory that he's cooked up. I mean, we're talking about, let's say, low voltage exposure. We're talking about touching an outlet. And from that outlet touch, you have all of these diffuse symptoms that an individual can experience. But didn't he compare that to the literature and say there's a bunch of cases where they have low voltage injuries or accidents and they have these symptoms? In those cases, often, Your Honor, talk about low voltage being a thousand volts. We're talking about at most, if we have a conversation about the voltage, you're 110. But by our view, 48 to 51 or 41 to 58, it's a very low voltage shock to have this array of consequences. So can it be tested? No. Is there any science explaining how this happens? No. Dr. Morse himself admits this. He says no diagnostic tools, so you can't replicate this, and no science that does the connection. He can't explain how the science makes it possible for this type of low voltage exposure to result in the injury that we have. And you think that observation of similar cases is not science? It's not anything that he has himself said is possible. In terms of the reliability factors we look to, you can't replicate this. Do you want to save the remaining time for rebuttal? You have a minute and a half. Let me invade it just a little bit, if I could, Your Honor. Can we evaluate the error rate on this? No, for the same reason. Is it generally accepted in the scientific community? No, Dr. Clardy says in his testimony, absolutely not. And then I think the clinching factor is there's not a single, not one, not a single reported case anywhere in the United States of America, federal court, state court, that accepts this theory of low voltage diffuse electrical injury as something that an expert can testify to with reliability. It then pollutes the whole conversation with respect to the expert witnesses that the plaintiff presented under the differential diagnosis protocol. For those reasons, we believe the district court's decision was erroneous and ask that the court reverse. Thank you. Good morning. May it please the court. Howard Goodfriend representing the appellees, Roger and Elyse Murray, Steve Furey, trial counsel is at counsel table with me. Let me address first the instructional issue. There's no issue here about stevedore liability. Judge Lasnik found in his post-trial order that the stevedore was a non-entity at trial that was not part of any defense. There was no dispute. And I reiterate that. I think it's in the pretrial order. No dispute that the floodlight at issue here was the vessel owner's light under the vessel owner's control. And when it malfunctioned, resulting in the shock that injured Mr. Murray, was inspected by the vessel ownership engineer who reported that it was in very poor condition and should not have been used for service. And this was the condition that it was in. This is exhibit 211. It's in the excerpts of record. The cord itself should have put the vessel owner on notice that it was defective because it was spliced in several places. It had clearly suffered water damage and salt damage. And when the experts took the light apart, they found, in fact, that not only had the ground wires been cut, but there was contact with the live portion, live wires, terminals, and the housing was charged. With respect, you have argued in your brief that there was a waiver with respect to this particular instruction. And Mr. Talmadge has come back and said, you really need to examine that in the context of two other instructions that were proposed but not given, 17 and 19, so that, in effect, there was a challenge to the instruction. So I would appreciate your response to that. Well, there wasn't a challenge to the instruction. I mean, let's talk about the three arguments. I think there was a challenge to the duty to inspect, and I'll address that at the end of the other ones. The other arguments in the brief is that the turnover duty by its theory somehow might have gotten confused that we were arguing for an ongoing duty after cargo operations commenced. There was no exception to the omission of before. And, in fact, you know, had there been, I'm sure we would have readily agreed that we could put it in there because there was no theory, no evidence, and no discussion or argument that the vessel, that the hazardous condition here occurred after cargo operations began. It was undisputed that this was a condition that existed at the time of turnover. And there's no dispute that the owner put this defective light on the catwalk before turning the vessel over to cargo operations. And I think Judge Lasnik remarked on that as well. As to the turnover duty being owed to the stevedore as opposed to the longshoreman, that was also not discussed. There was a challenge, I think, in the post-trial motion about the failure to instruct on the stevedore's duty, and that's the point at which Judge Lasnik remarked the stevedore's negligence was not an issue here. It was undisputed that this was your light, and the stevedore was not, if mentioned, barely mentioned at trial. Second of all, as to... So you're suggesting, then, that his argument, that the argument I have to look at as to Instruction 14 is really on the failure to give 17 and 19 proposed by him is wrong? Yeah. I mean, the arguments that he has made in terms of the error in Instruction 14, that it imposed a continuing duty, was never addressed in the exceptions. And the argument that there was a duty, that the duty is owed to the stevedore and not the longshoreman, was never accepted to. Unless until after. Until after. And it's wrong. I mean, this Court, I think in Thomas v. Newton said, that's a 1994 case, while often framed in terms of the stevedore, the turnover duty runs to the longshoreman. And Scandi and Hallett talk about the exposure to the stevedore's workers, not to the company. I mean, it's a tort duty owed to an individual engaged in this operation. So even if had there been an exception, I think this Court should reject it. The duty of inspection, there was an exception to that. And to say that there's, that these instructions, you know, allowed strict liability based on unseaworthiness, not a finding of negligence, ignores not only Instruction 14, but all the other instructions that were given, including the two immediately preceding it. Twelve is the summary of claims that says the defendants were negligent, the plaintiffs contend the defendants were negligent because the vessel and its equipment were not turned over in a condition that an expert and experienced longshoreman would be able, by the exercise of reasonable care, to carry on his or her work. Negligence, reasonable care. Instruction 13, the next one, the elements instruction. The first element is defendants turned over the APL Ireland and equipment in such a condition that an expert and experienced longshoreman would not be able, by the exercise of reasonable care, to carry on his work on the vessel. And two, defendants knew or should have known of the unreasonably dangerous condition. And then you get to 14, which talks about the turnover duty. Defendants have a duty to use reasonable care to turn over the vessel. And it goes on to talk about an expert and experienced longshoreman again. And then the second sentence, which is the only part they accept to, in exercising such reasonable care, defendants have a duty to take reasonable steps to inspect the vessel and its equipment. It's clear that such reasonable care refers to the preceding sentence about the turnover duty. Now, does that include a duty to inspect? Yes. This court has held that in Hedrick, 1983. But in Cyndia and Hallett, the court talks about the turnover duty in terms of what the vessel owner knows or should have known about a hazardous condition that it controls. And if you limit to no, you could eliminate the duty of inspection. But if there is tort liability, as there always is for what the reasonable man should have done under the same or similar circumstances, it's reasonable. And in fact, as you pointed out, Judge Smith, in the owner's own manual that says there's a duty to make sure electrical equipment is in good working order, there is a duty to find hazards like this that would put a reasonable person on notice that there is a defect. And as the plaintiff's expert said, that this instrument, this piece of equipment was an electrocution waiting to happen. Let me turn, if you don't have any additional questions about the jury instruction, let me turn to the Daubert issue. There's really two, I think, issues, scientific theories that are under attack here. One is that electrical injury can be diffuse. That is, a person can suffer injury not, you know, along the point of contact or the point of exit, but that electrical injury can cause central nervous system damage, anxiety, emotional problems, headaches, balance issues. And yes, it's true. No one knows why, no one knows exactly the mechanism that that operates. All the experts agree on that. And that's true with high-voltage electrical injury or low-voltage electrical injury. The theory of diffuse electrical injury, though, is well-established, and even the defendant's experts acknowledged it. So when they say we don't have any scientific theory to support how someone can be injured like this, that it might be accurate that no one actually knows the mechanism of it, but it's widely and uniformly recognized. Now, the more, I think, the more disputed theory is that injury can occur from not only high-voltage electrical shock, but low-voltage electrical shock. And that was addressed by Judge Lasnik in his order on Daubert. He took to heart, I would say, this Court's admonition or reversal in Barabin, where he had no hearing, made no findings, and the Court told him, next time, do it right and show your work. And that is exactly what he did. He actually said on the record at ER 479, it's in there, to the extent I didn't drill down enough and make the record sufficient, I don't want to be in that situation again. I don't want to have a three-week trial where the plaintiff died while it was on appeal and have to go back and do it over again. So what did he do? He continued the trial to conduct a hearing in court. He allowed both sides to submit additional scientific literature and authority at the conclusion of the hearing. Whatever you want to, any literature that's out there, I will read it. Give it to me. And then he waited, he read it, and he expressly addressed the Daubert factors in a written order, finding Dr. Morse's theory both scientific and relevant under ER 702. He did that, and here's what he found, that Dr. Morse was a well-established expert in biomedical electrical engineering, that he has published on low-voltage electrical shock, causing symptoms in peer-reviewed journals, that his theories were not developed for purposes of litigation, and that they were supported by other studies of extended symptomology of low-voltage shock. A whole body of literature, quite a few articles, they've been cited, and some of which were acknowledged by the defense-owned experts as by credible experts in the field. So he let the evidence in, and he allowed the defense to cross-examine Dr. Morse on whether the phenomenon of diffuse electrical injury is a good one, A, and whether it's gained general acceptance, and whether, in fact, it applies to Mr. Murray at the level of shock. That's the four elements which Mr. Talmadge discussed. First of all, what about testability? There were no animal tests that were referred to to show low-voltage damage. How can this theory of low-voltage injury be scientifically tested? What is the methodology by which we can apply it in another case? Well, what Dr. Morse explained was the methodology is you look at individuals' symptoms. Self-reported, unchecked-out reports. True. It's injuries, but there's nothing that uncommon. How can you determine an error rate under that situation? You can never know whether the person referring the injury to the voltage is correct or not. I would agree with you that you can't determine an error rate. But let me emphasize again that the four factors that they rely on and that come from Daubert are non-exclusive. The Court said that repeatedly, that this is vested in the District Court's discretion. Different scientific theories will result in different factors being used. What he relied on was peer-reviewed, other recognized scientists recognize it, not prepared for purposes of litigation, and he's a well-established expert in biomedical electrical engineering that the other academics in this field recognize. Is that an abusive discretion to rely on those factors? If you had to find an error rate every time a scientific theory came around, you would require human experimentation for all kinds of terrible things, I think. And it's unreasonable to rely exclusively on that factor in this type of scientific testimony. The second one he mentioned was that there's no scientific explanation, and I think Dr. Morse was quite clear on that. He said it must be something with the cells. And I addressed that. I think that goes to the whole notion of diffuse electrical injury, either high voltage or low voltage. No one knows what... Dr. Morse is not a medical doctor, right? Dr. Morse is not a medical doctor. And he says that he can't explain it has to be some cell action that does this? He didn't say it has to be. He said that's the theory that people have espoused. You know, he relied on neurological studies by, you know, people who study the brain. He relied on histories of other accidents, right? Well, no, in terms of his trying to explain the mechanism for this, I think, you know, he's read other experts, and some of them are published on this neurological data. But again, high voltage electrical, diffuse electrical injury, I would submit that defendants wouldn't dispute that there is such a thing. No question. But they don't, they can't explain that mechanism either. That's the point I'm trying to make. Well, I remember a case years ago where a carpenter got an 11,000 volt wire in his hands and his arms were burnt. That explains the mechanism very easily, right? And that's not a diffuse injury. That's the difference. Not a diffuse injury. Right. So the question here is, is the idea of low voltage injury causing diffuse injury generally accepted? And what's the basis of saying that? Well, I mean, it's not a fry test. So you don't weigh up, you know, you don't But that is an element. It is an element. And I think what the district court found and what Dr. Morse's declaration and the literature that the district court solicited and read before he made that finding was it is recognized by other experts in this field apart from Dr. Morse. I'm sorry, I took you past your time. Thank you. Thank you. I think you have some rebuttal time, Mr. Talmadge. Just a couple of points very briefly, starting with the Daubert issue. First, no diagnostic tools. Dr. Morse says so in his testimony. That means that it's really a matter of impression. It's an impressionistic standard that's being advanced here by the plaintiffs for the reliability of this test, for the reliability of this theory. And that's not enough to establish the necessary reliability that this court articulated in Berman. Counsel has accepted the proposition it can't be replicated, the test. He's accepted the proposition that's not universally accepted in the scientific community. In fact, Dr. Morse himself says neurologists don't accept it as well. You have reliability problems with this test that make it something that's unacceptable under Daubert. Lastly, with respect to the instructional error issue, let me remind the court, of course, Judge Lasnik forgot about the fact that Instructions 17 and 19 proposed by the defense were at issue about the stevedore's duty in his post-trial order. In this case, what they're suggesting has to happen is that the vessel owner has to literally rip apart equipment on board the ship to assert that the equipment is sufficiently safe at the turnover time to establish the standard. This light that we're talking about was not something that was obvious, unlike Hedrick, where the splice was problematic and was visible. Here you had to rip apart the light to make this possible. You have an electrical officer that said, I've had no problems with this. He couldn't replicate the circumstances of Mr. Murray's injury post-accident, almost immediately thereafter. You have no indication to the vessel owner that this latent defect, one that had to be ripped apart in terms of this portable light, was something that was known to the vessel owner that they had an obligation to tell the stevedore about at the point of turnover. And I would note, as well, that the cargo manual issue is something that counsel raised for the very first time on appeal. It was not something that was argued to the district court below. For all these reasons, we believe the court should reverse the trial court's judgment here. Thank you. Thank you. Thank you both for your arguments this morning. The case just argued of Murray v. Southern Route Maritime is submitted. Steele-Klein v. The International Brotherhood of Teamsters is submitted on the briefs and we're adjourned.
judges: McKeown, Bea, N.R. Smith